UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DAMIEAN DEVON TOLSON, | |
| Plaintiff, | Case No. 3:19-cv-00175 |
| v. | Judge Eli J. Richardson |
| | Magistrate Judge Alistair E. Newbern |
| WARDEN WASHBURN, et al., | |
| Defendants. | |

To:     The Honorable Eli J. Richardson, District Judge

## REPORT AND RECOMMENDATION

This civil rights action stems from pro se Plaintiff Damiean Devon Tolson's confinement at the Trousdale Turner Correctional Center (TTCC) in Hartsville, Tennessee. (Doc. No. 46.) The amended complaint is before the Court for screening under 42 U.S.C. § 1997e(c).

## I.      Background

### A.      Initial Screening of Tolson's Complaint

Tolson commenced this action on February 22, 2019, by filing a complaint under 42 U.S.C. § 1983 against the following TTCC employees: Warden Washburn, Chief Howard, Case Manager T. Greer, and Correctional Officers Roach, Hudson, and Hunt.[1] (Doc. No. 1.) Tolson alleged that,

---

[1]      In a letter attached to his complaint, Tolson stated that he was unable to file an application to proceed *in forma pauperis* with the Court because prison officials at the TTCC refused to provide him with the necessary documents. (Doc. No. 1.) The Court judicially noticed that Tolson had previously filed at least nine lawsuits in federal courts in Tennessee, at least four of which were dismissed for failure to state a claim upon which relief could be granted. (Doc. No. 5.) The Court found that Tolson was barred from proceeding *in forma pauperis* in this action under 28 U.S.C. § 1915(g) and therefore ordered him to pay the filing fee. (*Id.*) Tolson did so on March 27, 2019. (Doc. No. 13.) In two recent orders, the Court inadvertently stated that Tolson is proceeding *in forma pauperis*. (Doc. Nos. 55, 56.) For the reasons just explained, he is not.

upon arrival at the TTCC on November 30, 2018, he was immediately placed in segregation without cause.[2] (Doc. No. 2.) After Tolson was successful in challenging a write-up for defiance and filed several grievances, Hudson, who was a disciplinary hearing officer at the TTCC, retaliated against Tolson by assaulting him on December 14, 2018. (*Id.*) Tolson defended himself and was punished as the aggressor in the incident. (*Id.*) Tolson was placed back in segregation, where Hudson issued an order that prevented Tolson from showering and deprived him of food for 48 hours. (*Id.*) Tolson was denied access to legal mail, legal assistance, and phone calls with his attorneys, which prevented him from meeting deadlines in an unspecified pending action. (Doc. Nos. 1, 2.) Tolson alleged that, while he was in segregation, TTCC officers allowed his property to be stolen or destroyed. (Doc. No. 2.) Tolson also alleged that he was denied a basic eye exam and haircuts despite several requests. (Doc. Nos. 1, 2.) After being released from punitive segregation on January 11, 2019, Tolson was reclassified to close custody and was told that he would be moved to a different segregation pod. (Doc. No. 2.) Tolson objected, but Hudson and Roach forced him to move by depriving him of food and water for an unspecified amount of time. (*Id.*)

The Court screened Tolson's complaint under 28 U.S.C. § 1915A and 42 U.S.C. § 1997e (Doc. Nos. 14, 15) and found that Tolson had stated several colorable claims against Hudson: a claim for excessive use of force based on the December 14, 2018 assault; an Eighth Amendment claim based on Tolson's allegation that Hudson deprived him of food and showers; and a retaliation claim based on Tolson's allegation that Hudson attacked him and otherwise mistreated

---

[2]     Tolson filed a motion for a temporary restraining order with his complaint. (Doc. No. 2.) In screening Tolson's complaint, the Court found that Tolson intended to incorporate the allegations of his motion for a temporary restraining order into his complaint and screened those allegations as well. (Doc. No. 14.) The Court denied Tolson's motion for a temporary restraining order. (Doc. No. 15.)

him for successfully challenging the defiance write-up and filing related grievances. (*Id.*) The Court also found that Tolson stated a colorable Eighth Amendment claim against Hudson and Roach by alleging that they deprived him of food and water to force him to move cells. (*Id.*) The Court dismissed Tolson's claims against the remaining defendants. (*Id.*)

### B. Tolson's Amended Complaint

After the Court screened Tolson's complaint, he repeatedly sought to amend it to add new defendants and allegations. (Doc. Nos. 16, 19, 20, 22, 25, 28, 40, 44.) On July 17, 2019, the Court found that, "given Tolson's pro se status and the difficulties he ha[d] allegedly encountered in receiving this Court's orders," Tolson could "file a comprehensive amended complaint that contains all of his allegations and claims against all defendants he intends to name." (Doc. No. 45, PageID# 307.) Tolson timely filed the operative amended complaint, which asserts various constitutional claims under § 1983 against the following TTCC employees in their individual and official capacities: Sergeants Scottie Roach and Scottie Hudson; Correctional Officers Carter, Naveret, Jent, and Harmon; Chief of Security Cosby; Administrative Assistant Poch; Mailroom Supervisors Nunley and Cooper; Case Manager Greer; and two John Does.[3] (Doc. No. 46.) Tolson seeks $200,000.00 in punitive and compensatory damages and an order allowing him to repurchase the property he lost at the TTCC. (*Id.*) Hudson and Roach have answered Tolson's amended complaint (Doc. No. 49).

---

[3]     Greer is named as a defendant in the caption of the amended complaint but appears to have been inadvertently excluded from the list of parties to the action. (Doc. No. 46.)

The allegations of the amended complaint are summarized below and are taken as true for the purpose of screening Tolson's amended complaint.[4]

### 1. Arrival at the TTCC and First Instances of Retaliation

Tolson arrived at the TTCC on November 30, 2018, and was immediately placed in segregation "for no reason whatsoever." (Doc. No. 46, PageID# 314.) On December 6, 2018, Tolson was written up for defiance by an officer named Gentry. (Doc. No. 46.) Tolson challenged the charge, which was dismissed the same day because Gentry gave false statements to support it. (*Id.*) Despite the dismissal, Tolson was kept in segregation for seven additional days. (*Id.*) During that time, Tolson was deprived of proper recreation, phone privileges, and access to legal assistance. (*Id.*) Tolson responded by filing grievances regarding the "unprofessional conduct" of the TTCC's employees. (*Id.* at PageID# 316.) Sergeants Roach and Hudson were in charge of Unit A, where Tolson was confined. (Doc. No. 46.)

Tolson was scheduled to be released from segregation on December 13, 2018.[5] (*Id.*) As he was leaving Unit A, Tolson encountered Hudson, "who signaled at [Tolson] with his middle finger[,]" cursed at Tolson, and "referenc[ed] the 'defiance' write-up that had been dismissed a week earlier . . . ." (*Id.* at PageID# 316.) Hudson then "snatched at" Tolson's Star of David necklace, and Tolson "defended himself." (*Id.*) Two of Hudson's inmate advisors intervened and attacked Tolson. (Doc. No. 46.) Eventually, the TTCC's "SORT Team" arrived and "used

---

[4]    The amended complaint's narrative is lengthy and disjointed, jumping unpredictably between time periods and claims. The summary that follows is the Court's best effort to organize Tolson's allegations.

[5]    In his original complaint, Tolson alleged that he was released from segregation and assaulted on December 14, 2018, not December 13, 2018. (Doc. No. 2.) This discrepancy has no impact on the Court's analysis of the second amended complaint.

excessive force in striking and spraying [Tolson]." (*Id.* at PageID# 316.) Tolson was placed in restraints, and Hudson and Roach returned him to his cell in segregation. (*Id.*)

There, Tolson requested medical attention. (Doc. No. 46.) A John Doe nurse came to Tolson's cell door "and just looked in and said 'he refused' and walked away with reckless abandon." (*Id.* at PageID# 316.) Another John Doe snatched Tolson's Star of David chain off his neck. (Doc. No. 46.) When Tolson asked what happened to his necklace, he was told he never had one. (*Id.*) Tolson alleges that he is an orthodox Jew and that he "has every right to don religious jewelry to sustain his faith . . . ." (*Id.* at PageID# 317.)

## 2. Thirty-Day Property Restriction

After the December 13, 2018 incident, Tolson was denied access to his personal property for thirty days. (Doc. No. 46.) Tolson was also denied "showers for 12 days" and deprived of food for two days. (*Id.* at PageID# 317.) He did not "get a [sleeping] mat for 3 days . . . ." (*Id.*) Correctional Officers Carter and Naveret told Tolson that they could not feed him or escort him to the shower, alleging that only a sergeant could do that. (Doc. No. 46.) But neither Hudson nor Roach ever came to feed Tolson or escort him to the shower. (*Id.*) In fact, Hudson and Roach had issued a directive "not to feed [Tolson] under [the] false premise that he was a[n] 'aggressive inmate[.]'" (*Id.* at PageID# 317.) Someone named Moyer in internal affairs finally fed Tolson after two days of deprivation. (Doc. No. 46.) Tolson alleges that Carter and Naveret were "in cahoots" with Hudson and Roach and deprived him of food and showers to retaliate against him "for the incident with SCO Hudson." (*Id.* at PageID# 317.)

While Tolson was placed on property restriction, he did not receive his legal mail and was prevented from pursuing "a legal malpractice case" that he had filed in Murfreesboro, Tennessee. (*Id.* at PageID# 316.) The presiding judge in that case had scheduled a phone call for January 8, 2019, but Tolson was denied access to the phone even after he explained that the call was time

5

sensitive. (Doc. No. 46.) The same thing happened on January 24, 2019. (*Id.*) Tolson also missed calls with his "criminal attorney" on January 4, 2019, and January 25, 2019, relating to an unspecified case, because Case Manager Greer falsely claimed that Tolson's attorney had provided a non-working phone number. (*Id.* at PageID# 318.) As a result of the missed calls, Tolson was unable to respond to certain scheduling orders. (Doc. No. 46.) Tolson was given ninety days from January 31, 2019, to show cause why his malpractice action should not be dismissed for failure to prosecute. (*Id.*) It is not clear whether Tolson was able to respond to that order.

### 3. Release from Property Restriction and Additional Retaliation

Tolson was released from property restriction on January 11, 2019, and was prepared to move to a new unit. (Doc. No. 46.) However, on that date, Tolson discovered that his personal property, totaling $1,500.00 in value, had "suddenly 'disappeared'" from the storage room. (*Id.* at PageID# 319.) Tolson refused to move without his property. (Doc. No. 46.) Roach and Hudson cut off the water to Tolson's cell and threatened to deny him food until he agreed to move. (*Id.*) Tolson relented after one or two hours and was taken to an upstairs cell in C Pod. (*Id.*) Tolson immediately complained that placement in an upstairs cell violated his doctor's orders—Tolson "has a bulging herniated disc in his back and is totally prohibited from climbing stairs . . . ." (*Id.* at PageID# 329.) Tolson's "Class B medical doctor's orders" also require that he be housed in a lower-level cell and provided two mats. (*Id.* at PageID# 320.) Roach and Hudson ignored Tolson's complaint and pushed him into his new cell, where he was paired with an "incompatible inmate." (*Id.* at PageID# 320.) Tolson and his new cellmate proceeded to argue loudly for thirty to forty-five minutes, until Roach, Carter, and Naveret moved Tolson to a lower-level cell. (Doc. No. 46.)

In early February 2019, Roach forced Tolson into an upstairs cell with the intention of "violat[ing] [Tolson's] medical orders . . ." and further retaliating against him. (*Id.* at PageID# 328.) On April 19, 2019, Tolson "collapsed attempting to climb the stairs to go back to

his cell[.]" (*Id.* at PageID# 329.) An injury report was not completed and Tolson did not receive a medical evaluation—instead, he was carried back to his cell, where he was placed with an incompatible inmate who did not share Tolson's custody level. (Doc. No. 46.) Later that night, Tolson asked Correctional Officer Jent to call Captain Maxwell so that Tolson could be moved back downstairs, consistent with his medical orders. (*Id.*) Jent responded by repeatedly stating that medical attention was on its way—but it did not come. (*Id.*)

The next morning, Jent came to Tolson's cell to deliver breakfast. (*Id.*) Tolson was in "obvious pain" and asked Jent to make an emergency call to the nurse because he had still not been seen after collapsing. (*Id.* at PageID# 329.) Tolson's left hand was hanging "over the tray flap" during this interaction. (*Id.* at PageID# 330.) Correctional Officer Harmon arrived at Tolson's cell, and he and Jent proceeded to "press all of their combined body weight on [Tolson's] hand with excessive force . . . ." (*Id.*) Tolson tried to relieve the pressure with his right hand, which also "became trapped in the tray flap[.]" (*Id.*) The attack "caus[ed] visible injuries to [Tolson's] hands and wrists." (*Id.*) Jent called Maxwell, who said that he would get medical staff to treat Tolson's injury and that he would move Tolson to a lower-level cell. (Doc. No. 46.) Despite those promises, Tolson did not receive medical attention, and he was not moved to a lower-level cell. (*Id.*) The lack of medical attention was consistent with his general experience at the TTCC: during his incarceration there, Tolson filed over fifty sick call requests in an effort to get his back and eyes examined but was never seen by medical staff. (*Id.*)

Tolson experienced other deprivations during the early months of 2019, all of which he viewed as retaliatory. (*Id.*) Tolson received one hygiene kit, containing soap and toothpaste, on January 25, 2019, and his requests for additional hygiene supplies were denied until March 26, 2019. (*Id.*) On February 26, 2019, Tolson received a write-up for sexual misconduct. (*Id.*) Hudson

presided over the hearing on the charge, found Tolson guilty, and then refused to provide Tolson with the paperwork needed to appeal the decision. (*Id.*) Tolson's repeated requests for a haircut were denied until he finally received one on April 26, 2019. (*Id.*)

### 4. Lost Property and Mailroom Issues

After Tolson was removed from property restriction on January 11, 2019, he repeatedly sought to reclaim his $1,500.00 worth of lost property. (*Id.*) On January 29, 2019, Tolson filed a lost property claim with the Tennessee Claims Commission. (*Id.*) The Claims Commission found that it lacked jurisdiction over Tolson's claim because the TTCC is operated by CoreCivic rather than the State of Tennessee. (*Id.*) Tolson then submitted a claim to Administrative Assistant Poch, who, along with Chief of Security Cosby and an unidentified warden, partially approved Tolson's claim, finding that Tolson was entitled to replacement of some of his property, including a Sony radio. (*Id.*)

A replacement radio was ordered on April 10, 2019, and arrived on April 17, 2019. (*Id.*) Chief Cosby and Warden Williams signed a letter the next day approving transfer of the radio to Tolson. (*Id.*) Despite the letter, certain "'[m]ailroom officials refused to deliver [Tolson] his radio[,]" claiming that Cosby and Williams's transfer authorization was invalid. (*Id.* at PageID# 324.) After thirty-five days, Tolson finally received a radio, but it was not the one he had ordered, and so he paid for a stamp to return the radio to Amazon. (Doc. No. 46.) While Tolson was fighting to obtain his radio, his legal mail was also being delivered excessively late: Tolson received a letter from his attorney on April 5, 2019, forty-six days after the letter was postmarked, and parts of the letter were missing; Tolson did not receive this Court's March 21, 2019 order for sixteen days; and there was a thirteen-day delay in receiving the Court's April 18, 2019 order. (*Id.*) Because Nunley and Cooper were mailroom supervisors, Tolson blames them for these delays.

(*Id.*) As Tolson was being transferred to another prison on June 7, 2019, he confronted Nunley about the issues with his radio, but she denied any knowledge of them. (*Id.*)

## II.     Legal Standard

The Court may sua sponte screen a complaint "brought with respect to prison conditions under section 1983 . . ., or any other federal law, by a prisoner . . . if . . . the action is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief." 42 U.S.C. § 1997e(c)(1); *see also Davis v. Gallagher*, 951 F.3d 743, 751 (6th Cir. 2020) (holding that, "whatever threshold dismissal determination a district court makes under § 1915A, it is allowed to make subsequent dismissal determinations in accordance with § 1997e(c)(1) where the claims at issue involve prison conditions"). The standard for reviewing an amended complaint under 42 U.S.C. § 1997e(c) is the same as the standard for evaluating motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Dickerson v. Parnell*, 101 F. App'x 587, 588 (6th Cir. 2004) (affirming district court's sua sponte dismissal of incarcerated plaintiff's case under 42 U.S.C. § 1997e(c) where plaintiff had failed to state a claim under Rule 12(b)(6)).

The Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

9

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A plaintiff must plead more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Tolson proceeds pro se, the Court construes his filings "'liberally'" and holds his amended complaint "'to less stringent standards than formal pleadings drafted by lawyers[.]'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). There are limits to liberal construction, however, and "courts are not required to conjure up unpleaded allegations or guess at the nature of an argument." *Brown v. Cracker Barrel Rest.*, 22 F. App'x 577, 578 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

## III.    Analysis

### A.    Excessive Force

Tolson alleges that excessive force was used against him on December 13, 2018, when he was attacked by Hudson, his inmate advisors, and members of the SORT team, and sometime in April, when Jent and Hudson put their combined weight on Tolson's hands while they were in his cell's tray flap. Because Tolson was a convicted and sentenced state prisoner at the time of these alleged attacks, his excessive force claims are analyzed under the Eighth Amendment. *See Leary v. Livingston Cty.*, 528 F.3d 438, 443 (6th Cir. 2008). Although prison officials may need to use force against incarcerated people to maintain prison security and discipline, such force violates the Eighth Amendment when it "'reflects an unnecessary and wanton infliction of pain.'" *Cordell v.*

*McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)).

An excessive force claim has objective and subjective components. The subjective component focuses on "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). Factors relevant to that inquiry include

> "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted," as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response."

*Id.* at 581 (alteration in original) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). "The objective component requires the plain inflicted to be 'sufficiently serious.'" *Id.* at 580 (alteration omitted) (quoting *Williams*, 631 F.3d at 383). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010) (quoting *Hudson*, 503 U.S. at 9–10). An incarcerated person "who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Id.* at 38 (quoting *Hudson*, 503 U.S. at 9). Nonetheless, the core inquiry in analyzing excessive force claims is "not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* at 37 (quoting *Hudson*, 503 U.S. at 7).

In screening Tolson's original complaint, the Court found that Tolson's allegation that Hudson "attacked [him] sporadically" because Hudson was angry about Tolson's success in

challenging a disciplinary charge amounted to "the bare minimum" required to state a colorable excessive force claim, even though Tolson had not alleged that he was injured as a result of the attack. (Doc. No. 14, PageID# 64, 65.) The Court found that the claim required "further development to determine what Hudson did and whether it was reasonable under the applicable standard." (*Id.* at PageID# 66.) The Court dismissed Tolson's claims against the other unidentified people who attacked him because Tolson did "not identify the individuals who sprayed him or name any John Doe defendants" relating to the incident. (*Id.*)

Tolson's amended complaint provides additional detail regarding the December 13, 2018 assault, but that detail undermines Tolson's claim against Hudson. Tolson alleges that, as he was being released from segregation, Hudson referenced the dismissed disciplinary charge and attempted to "provoke" Tolson by "snatch[ing] at his chain and Star of David," at which point Tolson defended himself. (Doc. No. 46, PageID# 316.) Two of Hudson's inmate advisors "attacked" Tolson and "[t]hen the T.T.C.C. SORT Team came to [the] rescue and they used excessive force in striking and spraying [Tolson]." (*Id.*) It appears that the extent of Hudson's assault on Tolson was Hudson's attempt to snatch Tolson's necklace. Tolson does not allege that Hudson caused him any harm or even that Hudson touched him. Hudson's effort to snatch Tolson's chain, by itself, is simply too *de minimis* a use of force to be the foundation for an excessive force claim. *See Wilkins*, 559 U.S. at 38. To the extent that Tolson seeks to hold Hudson liable for the force used by the inmate advisors or the SORT team after Tolson began to defend himself, he has not alleged that Hudson "'implicitly authorized, approved or knowingly acquiesced in'" their conduct as required to support a claim of supervisory liability. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). All that Tolson has alleged is that he was attacked by the inmate advisors and the SORT Team in Hudson's

presence, which is not enough to hold Hudson liable for their conduct. *Begley v. Tyree*, No. 17-5001, 2018 WL 3244508, at *3 (6th Cir. Feb. 13, 2018) ("At most, [plaintiff] alleged that [defendant] was present at the scene of an excessive-force incident, which does not by itself state a constitutional violation.").

Tolson's claims stemming from the April assault fare better. Tolson alleges that, after repeatedly requesting medical attention with his left hand hanging out of his cell's tray flap, Jent and Harmon put their combined weight on his hand. Tolson tried to relieve the pressure with his right hand, which also got caught in the flap. The attack caused Tolson visible injuries, including "swollen hands and wrists[] and scratches and bruising[.]" (Doc. No. 46, PageID# 330.) Further, Tolson's left hand is "permanently numb[.]" (*Id.*) These allegations are enough to state a colorable excessive force claim against Jent and Harmon. There is no apparent penological justification for this unprovoked attack, which occurred when Tolson was locked in his cell and after he had repeatedly complained of a back injury. Further, Tolson was seriously injured as a result of the attack. Accordingly, Tolson has stated excessive force claims against Jent and Harmon in their individual capacities.

### B. Deliberate Indifference to Medical Needs

Tolson's allegations concerning deprivation of medical care implicate the Eighth Amendment's prohibition of deliberate indifference to an incarcerated person's serious medical needs. Stating an Eighth Amendment claim for deliberate indifference requires a plaintiff to allege facts sufficient to support the claim's objective and subjective components. *Reilly v. Vadlamudi*, 680 F.3d 617, 623–24 (6th Cir. 2012). The objective component requires allegations that "establish the existence of a 'sufficiently serious' medical need." *Id.* at 624 (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). A plaintiff can satisfy the objective component by alleging that his injuries were "'diagnosed by a physician as mandating treatment'" or that they were "so

obvious that even a layperson would easily recognize the necessity for a doctor's attention" and medical care was not provided "'within a reasonable time frame.'" *Mattox v. Edelman*, 851 F.3d 583, 598 (6th Cir. 2017) (quoting *Blackmore*, 390 F.3d at 897, 899–900). The subjective component requires allegations showing that the defendant acted with "'a sufficiently culpable state of mind in denying medical care.'" *Id.* at 597–98 (quoting *Blackmore*, 390 F.3d at 895). A plaintiff meets that burden by alleging "that the official being sued subjectively perceived facts from which to infer substantial risk to the [plaintiff], that [the official] did in fact draw the inference, and that [the official] then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

Tolson has not adequately pleaded some of his deliberate indifference claims. Tolson alleges that, after the December 13, 2018 attack, a John Doe nurse came by his cell and refused to provide him with medical care. However, Tolson does not allege that he was injured during that attack or even that he told John Doe that he was injured. It is therefore impossible for the Court to infer that John Doe perceived and then disregarded a substantial risk of harm to Tolson. This claim against the John Doe nurse in his individual capacity fails. Tolson also alleges that, when he was returned to segregation after the attack, he was deprived of a sleeping mat for three days in violation of his medical order. Tolson does not specify who deprived him of the mat, and therefore it is impossible for him to satisfy the subjective component of this claim.

However, Tolson has adequately pleaded a deliberate indifference claim against Roach in his individual capacity. Tolson's allegation that a doctor issued an order prohibiting him from being housed in an upper-level cell or climbing stairs due to a herniated disc in his back is sufficient to show that Tolson's injury was diagnosed by a physician as requiring treatment. *See Mattox*, 851 F.3d at 598. Further, Tolson's allegation that Roach intentionally placed him upstairs to violate

14

that order establishes that Roach disregarded a substantial risk of harm to him. *See Comstock*, 273 F.3d at 703. Finally, Tolson alleges that Roach's decision caused him further injury—Tolson eventually collapsed while trying to climb the stairs to his cell and had to be carried back there. These allegations are enough to state a colorable deliberate indifference claim against Roach in his individual capacity.

Tolson has also adequately pleaded a deliberate indifference claim against Jent. Tolson alleges that, the night of the collapse, he asked Jent to contact Captain Maxwell so that Tolson could be moved to a lower-level cell consistent with his medical order. Jent repeatedly stated that medical attention was on its way, but it never came. The next morning, when Jent arrived at Tolson's cell to deliver breakfast, Tolson was in obvious pain and still requesting medical assistance. Rather than help Tolson get medical care, Jent injured him further, putting his weight on Tolson's hands, which were hanging from his cell's tray flap. These allegations are enough to establish that Jent was aware that Tolson faced a substantial risk of harm due to his back injury, and that he disregarded that risk, causing Tolson additional injury.[6] Tolson has therefore stated a colorable deliberate indifference claim against Jent in his individual capacity.

### C. General Conditions of Confinement

Tolson's allegations concerning deprivations of food, water, showers, haircuts, and hygiene kits and placement with an incompatible inmate must be analyzed in light of the Eighth Amendment's requirement that prison officials "provide humane conditions of confinement" and

---

[6] It is not clear whether Tolson intended to assert a deliberate indifference claim against Harmon based on this incident. Assuming he did, his allegations are insufficient to support the inference that Harmon was aware of Tolson's back injury. Tolson does not allege that he told Harmon that he had injured his back or that he directed any requests for medical assistance to Harmon. Accordingly, Tolson has not alleged that Harmon was aware of a substantial risk of harm to Tolson's back, and any deliberate indifference claim against Harmon fails.

"ensure that inmates receive adequate food, clothing, shelter, and medical care . . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987). To satisfy the objective component of a conditions-of-confinement claim, an incarcerated person "must allege that he has been deprived 'of the minimal civilized measure of life's necessities,'" *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)), such as "'essential food, medical care or sanitation[,]'" or subjected to "other conditions intolerable for prison[,]" *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010) (quoting *Rhodes*, 452 U.S. at 347). The subjective component is satisfied by allegations that the relevant official knew of and disregarded an excessive risk to the incarcerated person's health or safety. *Flanory*, 604 F.3d at 254.

Most of Tolson's allegations concerning the conditions of his confinement are insufficient to state an Eighth Amendment claim. Tolson alleges that he was deprived of hygiene kits for two months and that he was denied a haircut for five months. Such deprivations can raise Eighth Amendment concerns in some circumstances. *See id.* (holding that 337-day deprivation of toothpaste that caused plaintiff to develop periodontal disease was sufficient to satisfy objective component of Eighth Amendment claim); *cf. Baggett v. Fuson*, No. 3:14-cv-02366, 2015 WL 328348, at *4 (M.D. Tenn. Jan. 23, 2015) (dismissing plaintiffs' denial-of-haircut claims where they had "not allege[d] lack of shampoo or soap with which to wash their hair . . . [or] that they [had] been harmed by having to wear longer hair, such as a claim that they contracted lice"). But Tolson does not adequately link these deprivations to any individual defendant—Tolson claims he requested haircuts and hygiene kits without specifying to whom he made those requests. General

allegations of that nature are insufficient to establish the liability of a governmental official under § 1983, let alone the subjective component of an Eighth Amendment claim. *See Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (holding "'that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right'") (emphasis in original) (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)); *cf. Flanory*, 604 F.3d at 256 ("We have recognized an Eighth Amendment violation where the plaintiff can show an intent to inflict harm or punishment because the named defendants were involved in the . . . deprivation of hygiene items.").

Tolson's claims regarding his placement with an incompatible cellmate also fail. Tolson alleges that, despite his status as a close-custody inmate, Roach and Hudson twice forced him to share a cell with Mario Johnson, who was not on close custody. Tolson argues that Hudson and Roach violated Tennessee Department of Correction (TDOC) policy and the Eighth Amendment by requiring inmates of different custody levels to share a cell. Even if it is true that Hudson and Roach's decision violated TDOC policy, as the Court explained in its original screening order, "failure to comply with a state regulation is not itself a constitutional violation." *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992). Tolson has not alleged that housing him with Johnson presented any risk of harm and thus cannot establish that Hudson or Roach were deliberately indifferent to his safety in placing him with Johnson. *See Hugueley v. Haslam*, No. 3:16-cv-02885, 2017 WL 194288, at *5 (M.D. Tenn. Jan. 18, 2017) (finding that plaintiff had failed to plead deliberate indifference claim based on prison officials' choice to house him with incompatible prisoners where he had not alleged that failure "to keep incompatible prisoners separate from one another pose[d] any risk to his safety, let alone a 'substantial risk' . . ."). Accordingly, Tolson has

failed to plead an Eighth Amendment claim against Hudson or Roach in their individual capacities based on their decision to house Tolson with Johnson.

Tolson's claims concerning deprivations of food, water, and showers yield different results. In screening Tolson's original complaint, the Court found that he had stated a claim against Hudson based on the allegation that Hudson issued an order that prevented Tolson from showering for twelve days and denied him food for two days.[7] (Doc. No. 14.) Tolson's amended complaint provides additional detail regarding these deprivations and alleges that Hudson and Roach were both responsible for the order that deprived him of showers and food and that Carter and Naveret enforced it. Accordingly, Tolson has stated colorable Eighth Amendment claims against Hudson, Roach, Carter, and Naveret in their individual capacities based on these deprivations. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006) ("[I]t should come as no surprise that [inmate] had a clearly established right not to be deprived of food and water."); *Walker v. Mintzes*, 771 F.2d 920, 928 & n.5 (6th Cir. 1985) (holding that segregated inmates are entitled to at least one shower per week).

The same is not true of Tolson's claims based on Hudson and Roach's decision to deprive Tolson of food and cut off the water to his cell until he agreed to move to a new unit. Although the Court found that Tolson had stated a claim against Hudson based on this incident in screening the original complaint, that finding was based, in part, on the ambiguity surrounding the length of the

---

[7]     In allowing these claims to go forward, the Court noted that it was "cognizant of the fact that [Tolson had] not alleged any physical injuries arising from [the deprivation of showers and food], as required for an inmate to recover damages for any mental or emotional injury suffered while in custody." (Doc. No. 14, PageID# 72.) Nonetheless, the Court found that the question of "[w]hether the lack of physical injury constitutes a legal bar to [Tolson's] claim or simply limits the damages he might recover" was one that "require[d] further development to resolve" given that Tolson seeks punitive damages in this action. (*Id.*) That conclusion remains true in the context of this second screening.

18

deprivation. The Court concluded that the claim required further development to determine whether the deprivations "were prolonged enough to constitute cruel and unusual punishment." (Doc. No. 14, PageID# 72.) Tolson's amended complaint resolves this ambiguity, alleging that he was only deprived of food and water for one to two hours, until he agreed to move units. A deprivation of that length without other extenuating circumstances is simply too short to support an Eighth Amendment claim. *See Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001) (finding that plaintiff's allegations of "temporary inconveniences . . . did not demonstrate that the conditions [of the prison] fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency" and therefore failed to state conditions-of-confinement claims). Tolson has failed to plead an Eighth Amendment claim against Hudson or Roach in their individual capacities based on their temporary refusal to provide Tolson with food and his cell with water.

### D. Due Process

Most of Tolson's due process claims concern the confiscation and loss of his property. The Due Process Clause of the Fourteenth Amendment prohibits states from depriving any person of "'life, liberty, or property, without due process of law.'" *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014) (quoting U.S. Const. amend XIV, § 1). A procedural due process claim under 42 U.S.C. § 1983 focuses on the fairness of the procedure used to effect any such deprivation. *Id.* (quoting *EJS Props., LLC v. City of Toledo,* 698 F.3d 845, 855 (6th Cir. 2012)). Where, as here, a plaintiff alleges that property was lost due to random and unauthorized acts of government officials, "'postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide'; 'no matter how significant the private interest at stake and the risk of its erroneous deprivation, the State cannot be required constitutionally to do the impossible by providing predeprivation process.'" *Id.* at 905 (quoting

*Zinermon v. Burch*, 494 U.S. 113, 128–29 (1990)). In such a case, the plaintiff must plead that available postdeprivation remedies are inadequate to state a procedural due process claim. *See id.* at 910.

Tolson has failed to adequately plead his loss-of-property claims. In dismissing these claims in screening the original complaint, the Court found that Tolson had not pleaded the inadequacy of Tennessee's postdeprivation remedies for claims involving lost property. (Doc. No. 14.) Tolson has attempted to remedy that deficiency in his amended complaint, alleging that he pursued available remedies by filing a lost property claim with the Tennessee Claims Commission but that it was dismissed for lack of jurisdiction because the TTCC is run by CoreCivic. As a result of that dismissal, Tolson concludes that he has "no immediate action or remedy but to commence this action . . . ." (Doc. No. 46, PageID# 321.) Although Tennessee law allows claims asserting that a state employee negligently destroyed personal property to be filed in the Claims Commission, employees of private prison contractors like CoreCivic "are not state employees[,]" and therefore the Claims Commission provides no remedy for loss-of-property claims against CoreCivic employees. *Younger v. State*, 205 S.W.3d 494, 499 (Tenn. Ct. App. 2006). Instead, "negligence claims arising from [CoreCivic's] operation of correctional facilities" can be brought in state court against CoreCivic itself. *Martin v. State*, No. M1999-01642-COA-R3-CV, 2001 WL 747640, at *3 (Tenn. Ct. App. July 5, 2001); *see also Younger*, 205 S.W.3d at 499 ("[T]he proper defendant for negligence claims arising from the action of private contractors, or their employees, in operating correctional facilities is the contractor, and not the State."). Tolson has not alleged that this postdeprivation tort remedy against CoreCivic under Tennessee law is

inadequate, and therefore he has still failed to plead a procedural due process claim based on the various negligent deprivations of property that he chronicles in his amended complaint.[8]

Tolson also asserts due process claims stemming from his placement in segregation without a hearing upon arrival at the TTCC and Hudson's refusal to allow Tolson to appeal the February 26, 2019 finding that Tolson was guilty of sexual misconduct. "The Due Process Clause does not protect every administrative slight that occurs behind prison walls. It requires process only when a 'life, liberty, or property' interest is at stake." *Harden-Bey*, 524 F.3d at 791 (citing U.S. Const. amend. XIV, § 1). Despite the restriction of freedom that imprisonment entails, incarcerated people still "retain[] a 'liberty' interest, guarded by due process, with respect to state-imposed prison discipline that rises to the level of an 'atypical and significant hardship . . . .'" *Id.* at 792 (quoting *Sandlin v. Conner*, 515 U.S. 472, 484 (1995)). To trigger a cognizable liberty interest, prison "discipline must be unusual and substantial 'in relation to the ordinary incidents of prison life.'" *Id.* Factors relevant to that inquiry include the nature and duration of the discipline, as well as whether it will affect the overall duration of the incarcerated person's sentence. *Id.* at 795.

Tolson's allegations concerning his segregation and denial of access to a grievance appeal do not address an interest protected by the Due Process Clause. Although an indefinite period of segregation may implicate a protected liberty interest, *see id.* at 794, Tolson's alleged placement in segregation for two weeks upon arrival at the TTCC was too brief to constitute an atypical and

---

[8]     To the extent that Tolson seeks to allege violation of his constitutional or statutory religious rights based on the theft of his Star of David necklace, such a claim fails for the reason the Court explained in its original screening: although Tolson alleges that he is Jewish and that his spirit is being irreparably damaged by loss of the necklace, "he does not allege that this loss or any other action by Defendants has prevented or burdened his exercise of religion." (Doc. No. 14, PageID# 69); *see also Barhite v. Caruso*, 377 F. App'x 508, 511 (6th Cir. 2010) (holding that inmate's constitutional and statutory religious liberties claims failed where he did not allege that items seized were necessary for the practice of his religion or substantially burdened his religious exercise).

Case 3:19-cv-00175   Document 74   Filed 06/30/20   Page 21 of 27 PageID #: 488

significant hardship. *See Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997) (holding that 117-day delay in returning incarcerated plaintiff to the general population from administrative segregation was not atypical or significant hardship in the context of an overcrowded prison system). This Court, and many others, has found that an incarcerated person "does not have a constitutional right to an effective or responsive grievance procedure[.]" *Vick v. Core Civic*, 329 F. Supp. 3d 426, 444 (M.D. Tenn. 2018); *see also Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005) (collecting cases for the proposition "that there is no constitutionally protected due process right to unfettered access to prison grievance procedures"). Accordingly, Tolson's due process claim based on Hudson's refusal to allow him to appeal the finding of guilt on the sexual misconduct charge must also be dismissed.

### E.    Access to Courts and Counsel

Tolson has failed to plead a claim based on denial of his right to access the courts. Tolson alleges that he was denied access to legal resources, mail, and phone conversations with his attorney and that, as a result, he was prejudiced in pursuing a legal malpractice claim and in an unspecified criminal matter.[9] An incarcerated person's right to access to the courts "is not a generalized 'right to litigate' but a carefully-bounded right . . . [that] extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999). A legal malpractice claim "does not fall into the category of cases to which [Tolson] enjoys a constitutional right to access" and therefore any access claim based on obstruction of Tolson's malpractice action fails. *Fields v. Cty. of Lapeer*, No. 99-2191, 2000 WL

---

[9]    To the extent that Tolson seeks to assert an access-to-courts claim based on interference with his legal mail in this action, the claim fails because he has not alleged that he has been prejudiced as a result of such interference, and no prejudice to Tolson is independently apparent—each time that Tolson has raised concerns regarding missing or late mail in this case, those concerns have been addressed. (Doc. No. 38.)

1720727, at *1 (6th Cir. Nov. 8, 2000). Even where a right to access the courts exists, because that right "is 'ancillary to [a lost] underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court,' a successful access claim requires a prisoner to show that the defendants have scuttled his pursuit of a 'nonfrivolous, arguable' claim." *Sampson v. Garrett*, 917 F.3d 880, 881 (6th Cir. 2019) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)), *cert. denied*, 140 S. Ct. 528 (2019). Accordingly, "[l]ike any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Christopher*, 536 U.S. at 416. Tolson has provided no such allegations in his amended complaint, despite receiving notice from the Court's initial screening order of the applicable standard. Tolson's passing references to his legal malpractice claim and an unspecified criminal proceeding are not enough to provide fair notice of his access claims.

However, Tolson has adequately pleaded that Greer interfered with his Sixth Amendment right to counsel. The Sixth Amendment "'protect[s] the attorney-client relationship from intrusion in the criminal setting . . .'"). *Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 576–77 (1974)). Accordingly, "[i]n order to state a § 1983 cognizable claim for deprivation of right to counsel, there must be some allegation indicating an interference with the prisoner's relationship with counsel." *Id.* Tolson alleges that, on two occasions, Greer falsely stated that the phone number that Tolson's "criminal attorney" provided was invalid to prevent Tolson from participating in scheduled calls and that, as a result, Tolson was unable to respond to scheduling orders in an unspecified proceeding. At the screening stage, these allegations are sufficient to state a colorable claim against Greer in his individual capacity for interfering with Tolson's relationship with his criminal defense attorney.

### F.  Retaliation

Tolson alleges that most of the mistreatment that he endured at the TTCC was retaliatory. "It is well established that government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Thaddeus-X*, 175 F.3d at 386. To state a claim of First Amendment retaliation, an incarcerated person must allege "that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [incarcerated person's] protected conduct.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 394, 398).

In screening Tolson's original complaint, the Court found that Tolson had adequately pleaded a retaliation claim against Hudson in his individual capacity based on the December 13, 2018 attack, and that remains true in the context of the amended complaint. Tolson alleges that Hudson "only started to aggressively harass and pursue [him] after [he] got his 'defiance' write up dismissed on [December 6, 2018,] and filed grievances to the warden and commissioner citing the[] reckless negligence and unprofessional conduct at T.T.C.C." (Doc. No. 46, PageID# 316.) On December 13, 2018, Hudson mentioned the defiance write-up before snatching at Tolson's necklace. Filing grievances and challenging a write-up amount to protected conduct, *see Hill*, 630 F.3d at 472, and Hudson's attack was an adverse action sufficient to deter a person of ordinary fitness from engaging in that conduct, *see Loyde v. Jenkins*, No. 3:14-2311, 2015 WL 3645515, at *3 (M.D. Tenn. June 10, 2015) (finding that defendant's efforts to enlist other prison employees to attack the plaintiff amounted to an adverse action), *report and recommendation adopted by* 2015 WL 4479731 (M.D. Tenn. July 21, 2015). Finally, Tolson links the adverse action to the protected conduct by alleging that Hudson mentioned the dismissed write-up before he attacked Tolson.

However, Tolson's other allegations of retaliation fail to make that link. Tolson alleges that the following instances of mistreatment were all part of an effort to retaliate against him for the "incident with Hudson:" Carter and Naveret's refusal to provide Tolson with food or showers; Tolson's placement on thirty-day property restriction; Greer's interference with Tolson's phone calls; and Correctional Officer Zambrano's decision to charge Tolson with sexual misconduct. (Doc. No. 46.) But, as the Court explained in its original screening order, Tolson did not engage in protected conduct during the altercation with Hudson, and therefore any retaliation against Tolson based on that incident does not give rise to a claim under the First Amendment. (Doc. No. 14.) Accordingly, these claims must be dismissed.

### G. Official-Capacity Claims

Tolson also asserts claims against the defendants in their official capacities, alleging that they are employees of the TTCC and CoreCivic. (Doc. No. 46.) "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

To the extent the named defendants are employees of the TTCC, they are entitled to sovereign immunity from Tolson's claims for damages. *See Wingo v. Tenn. Dep't of Corr.*, 499 F. App'x 453, 454 (6th Cir. 2012) (holding that the Tennessee Department of Correction "and the prisons under its control are agencies of the state of Tennessee . . . and are entitled to Eleventh Amendment immunity from suit for damages"). Tennessee has not waived its sovereign immunity, *see id.*, nor has Congress abrogated Tennessee's immunity from damages claims brought under § 1983, *see Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) ("Section 1983 does not abrogate Eleventh Amendment immunity."). Although Tolson also seeks injunctive relief—namely, an order allowing him to purchase the property that was lost at the TTCC—all of the officials he has sued work at the TTCC, and Tolson is currently incarcerated at the Morgan County Correctional

Complex (MCCC) in Wartburg, Tennessee. (Doc. No. 51.) Thus, there is no indication that any of the officials sued in this action could be ordered to allow Tolson to replace his property at the MCCC. *See McNeil v. Cmty. Prob. Servs., LLC*, 945 F.3d 991, 995 (6th Cir. 2019) (explaining that, for the *Ex parte Young* exception to sovereign immunity to apply, the public official against whom prospective injunctive relief is sought must be "'actively involved with administering' the alleged violation" (quoting *Doe v. DeWine*, 910 F.3d 842, 849 (6th Cir. 2018))); *see also Colvin v. Caruso*, 605 F.3d 282, 295–96 (6th Cir. 2010) (holding that a prison transfer generally moots an incarcerated person's claim for injunctive relief unless the harm to be addressed travels with the person to the new prison). Tolson's claims against the defendants in their capacities as employees of the TTCC fail.

To the extent that the named defendants are employees of CoreCivic, rather than the TTCC, CoreCivic is not entitled to sovereign immunity and "may be liable under § 1983 'if its official policies or customs resulted in injury to [Tolson].'" *Vick*, 329 F. Supp. 3d at 445 (quoting *O'Brien v. Mich. Dep't of Corr.*, 592 F. App'x 338, 341 (6th Cir. 2014)); *see also Del Campo v. Kennedy*, 517 F.3d 1070, 1080–81 (9th Cir. 2008) ("The law makes clear that state sovereign immunity does not extend to private entities."). But Tolson does not allege that an official policy or custom of CoreCivic caused his injuries. The only allegation that remotely implicates CoreCivic in the violation of Tolson's rights is his claim that, despite a TDOC policy requiring sick call requests to be answered within a day, he submitted over fifty such requests during his incarceration at the TTCC and was never seen. Even if that allegation were liberally construed as an assertion that CoreCivic has a custom of ignoring requests for medical care at the TTCC, it would not be enough to state a claim against CoreCivic because Tolson "provides 'no [allegations] of any similar incidents' involving other inmates . . . ." *Nouri v. Cty. of Oakland*, 615 F. App'x 291, 296 (6th Cir.

2015) (first alteration in original) (quoting *Shorts v. Bartholomew*, 255 F. App'x 46, 58 (6th Cir. 2007)); *see id.* at 296 ("[W]e have never found notice of a pattern of misconduct (or the pattern itself) solely from the mistreatment of the plaintiff"). Accordingly, Tolson has failed to state a claim against any of the defendants in their capacities as employees of CoreCivic.

## IV.  Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that the following claims alleged by Tolson in the amended complaint be allowed to proceed: excessive force claims against Jent and Harmon in their individual capacities; deliberate indifference to medical needs claims against Jent and Roach in their individual capacities; conditions of confinement claims against Hudson, Roach, Carter, and Naveret in their individual capacities; a Sixth Amendment claim against Greer in her individual capacity; and a retaliation claim against Hudson in his individual capacity. The Magistrate Judge RECOMMENDS that all other claims be dismissed.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 30th day of June, 2020.

ALISTAIR E. NEWBERN
United States Magistrate Judge